**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**APPEAL No. 25-10465-A**

---

**UNITED STATES OF AMERICA,**

*Appellee,*

**v.**

**ERIK HADAD,**

*Appellant.*

---

***On Appeal from the United States District Court***
***For the Southern District of Florida***

---

**APPELLANT'S INITIAL BRIEF**

---


Howard Srebnick
Jackie Perczek
Alexa Klein
Edward Armellino
**BLACK SREBNICK**
201 South Biscayne Boulevard
Suite 1300
Miami, FL 33131
(305) 371-6421

*Counsel for Appellant*

**CERTIFICATE OF INTERESTED PERSONS**
**AND CORPORATE DISCLOSURE STATEMENT**

**Case No. 25-10465-A, *United States v. Hadad***

Appellant Erik Hadad, through undersigned counsel, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1.

| | |
|---|---|
| Armellino, Edward J. | Counsel for Defendant/Appellant |
| Black Srebnick | Counsel for Defendant/Appellant |
| Charest-Turken, Gabrielle | Assistant U.S. Attorney |
| Coakley, Brianna | Assistant U.S. Attorney |
| Cohen, Alix | Assistant U.S. Attorney |
| Elfenbein, Marty Fulgueira | U.S. Magistrate Judge |
| Forand, Peter | Assistant U.S. Attorney |
| Hadad, Erik | Defendant/Appellant |
| Keller, Zachary A. | Assistant U.S. Attorney |
| Klein, Alexa | Counsel for Defendant/Appellant |
| Lapointe, Markenzy | Former U.S. Attorney, SD Fla. |
| Matzkin, Daniel | Assistant U.S. Attorney |

| | |
|---|---|
| Moore, Hon. K. Michael | U.S. District Judge |
| O'Byrne, Hayden | Assistant U.S. Attorney |
| Perczek, Jackie | Counsel for Defendant/Appellant |
| Reding Quiñones, Jason A. | U.S. Attorney, SD Fla. |
| Schneider, Jean Louis | Complainant |
| Srebnick, Howard | Lead Counsel for Defendant/Appellant |
| Torres, Edwin G. | U.S. Magistrate Judge |
| Williams, Russell | Trial Counsel for Defendant/Appellant |

## STATEMENT REGARDING ORAL ARGUMENT

Hadad respectfully requests oral argument. This appeal presents substantial questions concerning the "intent to kill or seriously harm" element of 18 U.S.C. § 2119. Oral argument would assist the Court in addressing these important issues.

## TABLE OF CONTENTS

**PAGE(S)**

CERTIFICATE OF INTERESTED PERSONS ..........................................C-1 of 2

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF AUTHORITIES ..........................................................................v

STATUTORY PROVISIONS INVOLVED ....................................................... xii

STATEMENT OF JURISDICTION ................................................................ xiii

STATEMENT OF THE ISSUES .......................................................................1

STATEMENT OF THE CASE ...........................................................................2

Course of Proceedings .........................................................................................3

Statement of Facts ...............................................................................................7

A. Jean-Louis Purchases a Vehicle from Guru Auto Sales, then Defaults on the First and Second Payments.........................................7

B. Hadad Attempts to Repossess the Vehicle ..........................................9

C. Dismissal of the Florida State Case..................................................14

STANDARDS OF REVIEW ..........................................................................16

SUMMARY OF THE ARGUMENT ..............................................................17

ARGUMENT.....................................................................................................18

I. HADAD'S CARJACKING CONVICTION FOR ATTEMPTING TO REPOSSESS A VEHICLE FROM A DEBTOR IN DEFAULT SHOULD BE REVERSED, PARTICULARLY GIVEN THE SPECIAL VERDICT FINDING THAT HADAD DID NOT BRANDISH A FIREARM AND THE LACK OF EVIDENCE THAT HADAD INTENDED TO CAUSE DEATH OR SERIOUS BODILY HARM TO THE OCCUPANT OF THE VEHICLE WHOM HADAD DID NOT THREATEN OR TOUCH ........................................................18

II. HADAD IS ENTITLED TO A NEW TRIAL BECAUSE THE DISTRICT COURT ERRONEOUSLY INSTRUCTED THAT HIS SUBJECTIVE INTENT WAS "IRRELEVANT" AND IMPROPERLY EXCLUDED HIS TESTIMONY AND OTHER EXCULPATORY EVIDENCE REGARDING HIS LACK OF SPECIFIC INTENT TO CAUSE DEATH OR SERIOUS BODILY HARM ....... 28

A. The Modified Jury Instruction Erroneously Relieved the Government of Proving Hadad's Intent ....... 32

B. Hadad Should Have Been Permitted to Testify About His Lack of Intent to Kill/Harm ....... 39

C. Hadad Should Have Been Permitted to Present Evidence that the Occupant Knew the Vehicle was Subject to Repossession ....... 42

III. THE INDICTMENT SHOULD HAVE BEEN DISMISSED BECAUSE, AS A MATTER OF LAW, THE MOTOR VEHICLE, A SALVAGE WRECK THAT NEVER LEFT FLORIDA AFTER IT WAS REBUILT, LACKED A NEXUS TO INTERSTATE COMMERCE; ALTERNATIVELY, THE JURY, NOT THE JUDGE, SHOULD HAVE DECIDED THAT QUESTION ....... 46

IV. HADAD'S 96-MONTH SENTENCE, WHICH EXCEEDED THE GOVERNMENT'S REQUEST FOR A BOTTOM-END GUIDELINE SENTENCE, WAS UNREASONABLE GIVEN THE LACK OF THREATS OR VIOLENCE, THE ACQUITTAL ON THE GUN COUNT, AND THE JURY'S SPECIAL INTERROGATORY FINDING THAT HADAD DID NOT BRANDISH THE GUN ....... 48

A. The Court Erred in Enhancing Hadad's Sentence Based on the Acquitted Conduct Involving the Firearm ....... 48

B. The Court Erred by Denying Hadad a Reduction Under U.S.S.G. § 4C1.1(a) Based on its Erroneous Finding that Hadad "Possessed a Firearm in Connection with the Offense" ....... 52

C. The Court Erred in Applying the Enhancement for Perjury/Obstruction of Justice Where there was No Evidence that Hadad's Testimony Constituted Perjury ....... 52

D. Hadad Should Have Received a Downward Adjustment for Acceptance of Responsibility ....................................................... 54

E. Resentencing is Required Because the 96-Month Sentence was Unreasonable ....................................................................... 55

CONCLUSION ....................................................................................... 57

CERTIFICATE OF COMPLIANCE ....................................................... 58

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993) ........................................ 40

*Diaz v. United States*,
602 U.S. 526 (2024) ........................................ 40

*Elonis v. United States*,
575 U.S. 723 (2015) ........................................ 36

*Holloway v. United States*,
526 U.S. 1 (1999) ........................................ *passim*

*In re Smith,*
829 F.3d 1276 (11th Cir. 2016) ........................................ 20

*McClinton v. United States*,
143 S. Ct. 2400 (2023) ........................................ 51, 52

*Ovalles v. United States*,
905 F.3d 1300 (11th Cir. 2018) ........................................ 20, 21, 23

*Rock v. Arkansas*,
483 U.S. 44 (1987) ........................................ 39

*Ruan v. United States*,
597 U.S. 450 (2022) ........................................ 37, 38

*Shaffer v. United States*,
308 F.2d 654 (5th Cir. 1962) ........................................ *passim*

*United States v. Adams*,
265 F.3d 420 (6th Cir. 2001) ........................................ 24

*United States v. Anderson*,
108 F.3d 478 (3d Cir. 1997) ........................................ 24

**CASES** **PAGE(S)**

*United States v. Archer*,
531 F.3d 1347 (11th Cir. 2008) ....................................................................56

*United States v. Bailey*,
819 F.3d 92 (4th Cir. 2016)....................................................................24, 25

*United States v. Baker*,
669 F. App'x 525 (11th Cir. 2016) ..............................................................23

*United States v. Brooks*,
270 F. App'x 847 (11th Cir. 2008) ..............................................................50

*United States v. Bush*,
110 F. 4th 1246 (11th Cir. 2024)....................................................................39

*United States v. Carter*,
695 F.3d 690 (7th Cir. 2012) ........................................................................24

*United States v. Cortes*,
299 F.3d 1030 (9th Cir. 2002) ......................................................................54

*United States v. Davis*,
109 F.4th 1320 (11th Cir. 2024) ..................................................................23

*United States v. Dean*,
810 F.3d 521 (8th Cir. 2015)..........................................................................24

*United States v. Diaz-Rosado*,
857 F.3d 116 (1st Cir. 2017) ..................................................................26, 27

*United States v. Diaz*,
248 F.3d 1065 (11th Cir. 2001) .......................................................18, 20, 23

*United States v. Dohan*,
508 F.3d 989 (11th Cir. 2007) ......................................................................16

*United States v. Douglas*,
489 F.3d 1117 (11th Cir. 2007) ....................................................................23

**CASES** **PAGE(S)**

*United States v. Dunnigan*,
507 U.S. 87 (1993) ....................................................................53

*United States v. Edmondson*,
410 F.2d 670 (5th Cir. 1969) ....................................................................54

*United States v. Felder*,
993 F.3d 57 (2d Cir. 2021) ....................................................................24

*United States v. Frank*,
292 F. App’x 618 (9th Cir. 2008) ....................................................................24

*United States v. Frye*,
489 F.3d 201 (5th Cir. 2007) ....................................................................24

*United States v. Fulford*,
267 F.3d 1241 (11th Cir. 2001) ....................................................................23

*United States v. Gamble*,
939 F. Supp. 569 (E.D. Mich. 1996) ....................................................46, 47

*United States v. Gamory*,
635 F.3d 480 (11th Cir. 2011) ....................................................................16

*United States v. Garcia-Alvarez*,
541 F.3d 8 (1st Cir. 2008) ....................................................................23

*United States v. Graham*,
123 F.4th 1197 (11th Cir. 2024) ....................................................40, 46

*United States v. Green*,
664 F. App’x 193 (3d Cir. 2016) ....................................................................24

*United States v. Grigsby*,
111 F.3d 806 (11th Cir. 1997) ....................................................................16

*United States v. Guerrero-Narvaez*,
29 F.4th 1 (1st Cir. 2022) ....................................................22, 25, 26, 27

**CASES** **PAGE(S)**

*United States v. Guilbert*,
692 F.2d 1340 (11th Cir. 1982) .......................................................*passim*

*United States v. Hunter*,
932 F.3d 610 (7th Cir. 2019) ..................................................................24

*United States v. Johnson*,
56 F.3d 947 (8th Cir. 1995) ...............................................................46, 47

*United States v. Keene*,
470 F.3d 1347 (11th Cir. 2006) .........................................................55, 56

*United States v. Killen*,
729 F. App'x 703 (11th Cir. 2018) ..........................................................57

*United States v. Kimble*,
178 F.3d 1163 (11th Cir. 1999) ...............................................................23

*United States v. Lebron Cepeda*,
324 F.3d 52 (1st Cir. 2003) .....................................................................24

*United States v. Leon*,
713 F. App'x 948 (11th Cir. 2017) ..........................................................23

*United States v. Lumley*,
135 F.3d 758 (11th Cir. 1998) .................................................................23

*United States v. Mack*,
729 F.3d 594 (6th Cir. 2013) ..................................................................24

*United States v. Maddox*,
803 F.3d 1215 (11th Cir. 2015) ...............................................................16

*United States v. Monroe*,
353 F.3d 1346 (11th Cir. 2003) ...............................................................16

*United States v. Nukida*,
8 F.3d 666 (9th Cir. 1993) ................................................................47, 48

**CASES** **PAGE(S)**

*Unites States v. Oudomsine,*
57 F.4th 1262 (11th Cir. 2023) ....................................................................56

*United States v. Perez-Franco*,
873 F.2d 455 (1st Cir. 1989) ........................................................................55

*United States v. Plate*,
839 F.3d 950 (11th Cir. 2016) ......................................................................57

*United States v. Reed*,
778 F. App'x 654 (11th Cir. 2019) ...............................................................23

*United States v. Rodriguez*,
741 F. Supp. 12 (D.D.C. 1990) ....................................................................55

*United States v. Ruan*,
56 F.4th 1291 (11th Cir. 2023) ..............................................................16, 38

*United States v. Scott*,
909 F.2d 488 (11th Cir. 1990) ......................................................................39

*United States v. Shanks*,
2025 WL 1621179 (11th Cir. Jun. 9, 2025)..........................................49, 51

*United States v. Singh*,
291 F.3d 756 (11th Cir. 2002) ......................................................................53

*United States v. Sjeklocha*,
114 F.3d 1085 (11th Cir. 1997) ....................................................................16

*United States v. Tobin*,
576 F.2d 687 (5th Cir. 1978) ........................................................................47

*United States v. Tokars*,
95 F.3d 1520 (11th Cir. 1996) ......................................................................16

**CASES** **PAGE(S)**

*United States v. Vallejos*,
421 F.3d 1119 (10th Cir. 2005) ....................24

*United States v. Vargas*,
792 F.App'x 764 (11th Cir. 2019) ....................50

*United States v. White*,
2023 WL 9016456 (11th Cir. Dec. 29, 2023)....................23

*United States v. Whitley*,
105 F.4th 672 (4th Cir. 2024) ....................24

*United States v. Whyte*,
928 F.3d 1317 (11th Cir. 2019) ....................39

*United States v. Word*,
129 F.3d 1209 (11th Cir. 1997) ....................41, 42, 45

*Washington v. Texas*,
388 U.S. 14 (1967) ....................39

*Weiler v. United States*,
323 U.S. 606 (1945) ....................54

**FEDERAL STATUTES AND RULES**

18 U.S.C. § 875(c) ....................36

18 U.S.C. § 924(c) ....................18, 51, 57

18 U.S.C. § 924(c)(1)(A)(ii) ....................xiv

18 U.S.C. § 2119 ....................*passim*

18 U.S.C. § 3553(a) ....................48, 56

18 U.S.C. § 3553(c)(1) ....................56

**FEDERAL STATUTES AND RULES** **PAGE(S)**

18 U.S.C. § 3231 .......... xiii

21 U.S.C. § 841 .......... 37, 38

21 U.S.C. § 2313 .......... 48

28 U.S.C. § 1291 .......... xiii

28 U.S.C. § 2255 .......... 42, 44

Fed. R. Evid. 404 .......... 42

Fed. R. Evid. 608 .......... 42

Fed. R. Evid. 704(b) .......... 40

**STATE STATUTES**

Fla. Stat. § 319.30(1)(r) .......... 46

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. § 1B1.3 .......... 50

U.S.S.G. § 1B1.3(c) .......... 49

U.S.S.G. § 2B3.1(b)(2)(C) .......... 48

U.S.S.G. § 3C1.1 .......... 52

U.S.S.G. § 3E1.1 .......... 54, 55

U.S.S.G. § 3E1.1(a) .......... 54

U.S.S.G. § 4C1.1(a) .......... 52

U.S.S.G. § 4C1.1(a)(7) .......... 52

## STATUTORY PROVISIONS INVOLVED

### Count 1 - Carjacking
### 18 U.S.C. § 2119(1)

Whoever, with the intent to cause death or serious bodily harm[,] takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—

> **(1)** be fined under this title or imprisoned not more than 15 years, or both . . . .

### Count 2 - Brandishing a Firearm During and in Relation to a Crime of Violence
### 18 U.S.C. § 924(c)(1)(A)(ii)

**(c)(1)(A)** Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

> **(ii)** if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years . . . .

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. Judgment was entered on February 6, 2025. ECF#134. The notice of appeal was filed on February 11, 2025. ECF#136. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

I. Whether Hadad's carjacking conviction for attempting to repossess a vehicle from a debtor in default should be reversed, particularly given the special verdict finding that Hadad did not brandish a firearm and the lack of evidence that Hadad intended to cause death or serious bodily harm to the occupant of the vehicle whom Hadad did not threaten or touch.

II. Whether Hadad is entitled to a new trial because the district court erroneously instructed that his subjective intent was "irrelevant" and improperly excluded his testimony and other exculpatory evidence regarding his lack of specific intent to cause death or serious bodily harm.

III. Whether the indictment should have been dismissed because, as a matter of law, the motor vehicle, a salvage wreck that never left Florida after it was rebuilt, lacked a nexus to interstate commerce; alternatively, whether the jury, not the judge, should have decided that question.

IV. Whether the 96-month sentence, which exceeded the government's request for a bottom-end guideline sentence, was unreasonable given the lack of threats or violence, the acquittal on the gun count, and the jury's special interrogatory finding that Hadad did not brandish the gun.

## STATEMENT OF THE CASE

Erik Hadad, a 59-year-old grandfather, worked at Guru Auto Sales, a small family-run car lot owned by his son. On December 19, 2023, Hadad repossessed a car from Schneider Jean-Louis ("Jean-Louis"), a customer who had defaulted on his car loan. Hadad employed no physical force, made no threats of physical violence, and never touched Jean-Louis. Nevertheless, Hadad was charged with carjacking and "using or carrying a firearm during and in relation to" a carjacking.

A jury found Hadad not guilty of the firearm charge, and in a special interrogatory found that the government did not prove that Hadad "brandished" a firearm. But the jury convicted Hadad of carjacking after the district court said "[Hadad's] intent we've already discussed is irrelevant," and then instructed the jury that, "[t]o decide whether the Defendant intended to cause death or serious bodily harm," an essential element of carjacking, "the Defendant's intent is *not* to be measured by any secret motive or undisclosed purpose merely to frighten, not to hurt, but rather is to be judged objectively from his conduct," excluding from consideration Hadad's testimony and other evidence of his actual intent.

## COURSE OF PROCEEDINGS

Carjacking requires proof that the defendant took a motor vehicle by force and violence or intimidation with the specific intent to kill or cause serious bodily harm. 18 U.S.C. § 2119. The jury was instructed that the government's theory of prosecution was "that the defendant intended to cause death or serious bodily harm if the victim refused to turn over the car." ECF#90:199. And that if "the defendant had that intent, then the Government has proved this element of the offense." ECF#90:199.

Hadad's defense was that he had a noncriminal purpose—repossession, not robbery—and did not intend to kill or harm Jean-Louis to repossess the car. The government moved in limine to exclude this defense at trial. ECF#28. The magistrate judge ruled that "the intent element—whether Defendant intended to cause death or serious bodily harm—is measured 'objectively from the visible conduct of the actor and what one in the position of the victim might reasonably conclude,' and not by the subjective motivation of Defendant." ECF#62:7-8. The magistrate judge also ruled that the government could call an expert in its case-in-chief to testify about industry standards for repossessions in Florida. ECF#62:20.

Separately, the magistrate judge recommended denial of Hadad's motion to dismiss the indictment challenging the car's nexus to interstate commerce, ECF#17,

ECF#32, and exclusion of evidence of the car's *intra*state status. ECF#28:15, ECF#62. The district court adopted the recommendation. ECF#59.

During the two-day trial, the government called the occupant of the vehicle, the president of the bank that made the car loan, a repossession expert, and police officers; Hadad and his son Eden testified in the defense case. ECF#92:32, 100, 90:22, 76, 115.

Hadad's motion for judgment of acquittal was denied. ECF#90:154, 158.

At the government's request and over defense objection, the Court modified the specific intent pattern instruction, ECF#90:156 ("THE COURT: [T]o the extent that you may want to argue or get into [Hadad's] subjective intent that that would be relevant to that, to addressing that issue. It's inconsistent with the Court's instruction on the law. I'll go ahead and change my mind on that and include [the government's proposed modification] in the instruction. I'll note the defense objection."), ultimately instructing that Hadad's subjective intent and motive were irrelevant. ECF#90:198-99; ECF#90:182, 183 ("THE COURT: His intent we've already discussed is irrelevant.").

During deliberations, the jury asked how to determine Hadad's specific intent:

**QUESTION/NOTE FROM THE**
**<u>JURY TO THE COURT</u>**

Please clarify if for Element 4 of Count 1, "intended to cause death or serious bodily harm," applies to the victim's conclusions and feelings on 12/19/23, or does it only take into account ~~the~~ defendant's actions and how Someone in the victim's position might reasonably conclude.

ECF#77. In response, the court re-read the modified instruction on specific intent, and the instructions on "serious bodily injury" and the government's theory of prosecution. ECF#90:206-209. About an hour later, the jury convicted on carjacking and acquitted on the firearm count. ECF#78. The jury also found, via special interrogatory, that the government did <u>not</u> prove Hadad "brandished the firearm while committing the offense charged in Count 1 [carjacking]." *Id*.

The court denied Hadad's post-verdict motions for judgment of acquittal, ECF#98, and for new trial. ECF#104; ECF#131 (order). Despite the acquittal and interrogatory, at sentencing the court overruled Hadad's objections to the guideline calculation and imposed a 96-month sentence, ECF#117; ECF#121; ECF#129; ECF#141—greater than the government requested, ECF#112—finding that Hadad possessed the firearm "in connection with" the carjacking:

> *I know how this deal went down*. Personally, I would have been scared to death. I would have thought -- and *I have had a gun pointed at me*. It's -- you know, I mean, you are looking at your life in front of you. In Miami, *when a guy shows up at your window pointing a gun at you…*

ECF#145:19 (emphasis added). No one testified that Hadad removed the gun from his waistband, much less pointed it at anyone.

Hadad, who is in custody, timely appealed. ECF#134, ECF#136. This Court denied Hadad's motion to file an oversized brief, granting leave to file a conforming brief by August 27, 2025. Docs. 21; 31.

## STATEMENT OF THE FACTS

### A. Jean-Louis Purchases a Vehicle from Guru Auto Sales, then Defaults on the First and Second Payments.

Hadad's son Yarin opened Guru Auto Sales ("Guru"), a mom-and-pop car lot where Hadad and his other son Eden worked. Guru sold used cars to "subprime" customers with poor credit or prior repossessions. ECF#90:77-79.

Guru worked with Mid-Atlantic Finance Company ("Mid-Atlantic"), which provided high-risk car loans. ECF#90:81. Mid-Atlantic would purchase a customer's loan from Guru, and the customer would make payments directly to Mid-Atlantic, the car's lienholder. ECF#92:102.

On October 9, 2023, Jean-Louis purchased a used Honda from Guru. ECF#90:80. Mid-Atlantic made the loan pursuant to a "Flex Line Agreement" with Guru. ECF#92:105-06; ECF#85-74:10. If Jean-Louis was late or missed either of the first two payments, Mid-Atlantic would give Guru a "Notice to Repurchase a Defaulted Contract," requiring Guru to buy back the loan. ECF#90:81-82, ECF#92:104-05; ECF#85-74:4. Only after Guru paid off Mid-Atlantic would Mid-Atlantic reassign the lien to Guru. ECF#92:105. If Jean-Louis made the first two payments timely, Mid-Atlantic would carry the risk of Jean-Louis' default. ECF#92:107.

Jean-Louis signed a purchase contract with Guru, which Eden reviewed with Jean-Louis while Jean-Louis' friend explained it to him. ECF#90:81-82. Jean-Louis

also signed a "Pre-Repo Agreement," authorizing Guru to repossess the car without notice or judicial intervention if Jean-Louis defaulted on his loan. ECF#90:84; ECF#17:47. The court would later exclude the Pre-Repo Agreement from evidence at trial. ECF#90:88.

Jean-Louis left with the Honda, then defaulted on the first and second payments. The first payment, due in November, bounced. ECF#92:111-12. This required Guru to buy back the loan. ECF#92:113. The November payment later cleared, then the December payment bounced. ECF#92:112-13; ECF#138-1; ECF#138-11; ECF#138-12. On December 14, 2023, Debra from Mid-Atlantic emailed Guru that Jean-Louis' loan was in "buy back status" and Guru owed Mid-Atlantic $12,075.83. ECF#92:114-115. The notification stated:

> No action may be taken against any contract by Guru Auto Sales, including repossession, until the contract has been repurchased.

ECF#92:116. Mid-Atlantic's president testified that on the day Hadad repossessed the car (December 19, 2023), Guru was not permitted to contact Jean-Louis about payment, had no lawful claim to the car, and was not authorized to repossess it. ECF#92:118-19.

In the defense case, Hadad's son Eden testified that "[Mid-Atlantic] terminated the contract because [Jean-Louis] had a few late payments and payments that had returned," meaning "Guru had to buy back the full loan plus fees" and therefore Guru "had to take control of the car now, to repossess the vehicle."

ECF#90:89. Eden testified that although the buy-back letter stated that Guru was not to contact Jean-Louis or repossess the car, "due to the fact that [Guru] had a good relationship with the bank, [Guru] spoke to Debra, [the] account representative," and Debra let them know that "[Guru] can repossess the vehicle because the bank still owed Guru" money on other loans. ECF#90:99-101. Eden believed that Mid-Atlantic had given Guru "authorization to pick up the vehicle." ECF#90:102.

Nevertheless, the government repeatedly argued at trial that Jean-Louis was "paid up" on the date of the incident (December 19), and therefore the car was not subject to repossession. ECF#92:19-23. Jean-Louis testified that his loan was current, ECF#92:34, and Mid-Atlantic's president testified that on December 19, Jean-Louis was "meeting all contractual obligations" and the loan was "current at that time." ECF#92:118-19, 126.

Their testimony was not true. Bank records subpoenaed post-trial by newly-retained counsel (undersigned) and introduced at sentencing established that Jean-Louis was *not* "paid up" or "current," and that Mid-Atlantic actually had a report showing that Jean-Louis' payment had bounced on December 19, the day Hadad repossessed the car. ECF#138-3; 138-11; 138-12.

**B. Hadad Attempts to Repossess the Vehicle.**

On December 18, after Guru received the Mid-Atlantic buy-back letter, Eden texted Jean-Louis to try "to get him to come bring the vehicle to the dealership."

ECF#90:91. Eden and Jean-Louis had texted before about a car inspection, so Jean-Louis knew Eden's number. ECF#92:143-44; 85-16-27. But Jean-Louis did not respond. ECF#85-28.

Hadad testified that on the morning of December 19, Guru employee Jackie reported that Jean-Louis was not responding to calls or messages. ECF#90:121. Jackie attempted to contact Jean-Louis' references and texted Jean-Louis, but Jean-Louis did not respond. ECF#90:121. And repossession agents could not locate Jean-Louis either. ECF#90:121. That morning, Hadad texted Jean-Louis:




ECF#90:123; 85-30. Jean-Louis testified that he didn't check his phone until later and then saw only the first line: "Good morning please call me ASAP to make payment a--" ECF#92:35-37; 85-31. Jean-Louis didn't open the message because the sender was unknown. ECF#92:36-37.

When Jean-Louis did not respond, Hadad offered to go to Jean-Louis' house "to locate the car." ECF#90:121-22. As he did every day, Hadad was carrying his firearm, for which he had a concealed-carry license. ECF#90:122. The firearm was holstered on his waistband, covered by his undershirt, t-shirt, and sweatshirt, with a bullet in the chamber and the safety locked. ECF#90:70,140,148; ECF#85:68.

Mark Lacek, an expert on industry standards for repossessions in Florida, testified that "Florida law very clearly states that a repossessor cannot carry a firearm" because it's dangerous. ECF#90:30. Lacek also testified that the person who repossesses the car has to be "legally entitled to the vehicle," "otherwise you're just stealing it." ECF#90:41. Lacek testified that a license is required in Florida to repossess a car. ECF#90:27. Hadad did not have one. ECF#92:139-140.

Hadad drove a black dealer BMW to Jean-Louis' house, where he located the Honda. ECF#90:122. Hadad notified his other son Yarin, who said he would call a repossession agent and to "keep [an] eye on the car." ECF#90:122-23.

Jean-Louis testified that he noticed the BMW outside his apartment and then following him on the highway. ECF#92:38. Jean-Louis said he was "[t]errified," "scared," and "shaken because [he] didn't know" who was in the car or "what was their intention." ECF#92:39. Jean-Louis said he didn't call the police because he was afraid to call, having never done so before. ECF#92:39-40.

When Jean-Louis stopped at a red light on LeJeune Road, Hadad exited the BMW and removed the expired temporary paper tag from the Honda. ECF#92:42-43. The parties' accounts of the interaction differ, although it is undisputed that Hadad made no verbal threats of violence and did not touch Jean-Louis or attempt to physically remove him from the car.

Jean-Louis testified that Hadad was yelling, "[g]et out of the fucking car." ECF#92:42. Hadad testified that he approached the window and said, "Jean, it's a repo, you have to stop," "[w]e have to take the car back to the office," but Jean-Louis dismissed him with his hand. ECF#90:124. Hadad testified he removed the expired tag thinking it was "the best way for [Jean-Louis] not to continue to drive until any repo company come to pick up the car." ECF#90:124.

When the light turned green, Jean-Louis drove towards the Tri-Rail station. ECF#92:44-45. Jean-Louis testified that it was "terrifying because I've never been in a situation like that and I don't know who was following me and the person was, like, chasing me down. So it was really terrifying." ECF#92:45.

Hadad followed Jean-Louis to the station and parked behind him. ECF#90:124-25. Hadad approached Jean-Louis, who was on the phone. ECF#90:12. Hadad testified that he let Jean-Louis finish his call, then Jean-Louis lowered the window and Hadad repeated that Guru had "to take the car" and that Jean-Louis had "to go to the office to try to save the deal." ECF#90:125-26. At Hadad's sentencing,

the court found that Hadad's statement that he let Jean-Louis finish the call constituted perjury and sentenced Hadad to more time in prison for that. ECF#141:12.

According to Jean-Louis, Hadad said to "just get out of the fucking car. Give me the fucking car key." ECF#92:48. Jean-Louis admitted that Hadad told him to "[g]o to the office. I've been calling you, texting you." ECF#92:90. Jean-Louis testified that he refused Hadad's multiple demands to surrender the car and that "I was just trying to, like, confront [Hadad]. 'No, I'm not giving you the car keys,' and things like that. And then [Hadad] was saying, 'Just go to the office. I don't want to know what you're saying. Just give me the car key.'" ECF#92:48-49.

Cellphone records showed that at 12:49p.m., Eden called Jean-Louis and they spoke for 71 seconds. ECF#90:16,19; ECF#90:126; ECF#85-56:2. Eden testified that he told Jean-Louis "that it is a repossession, and I let him know to give [Hadad] the keys and to come to the office and to see how we could resolve the deal for him." ECF#90:93; ECF#90:126. Hadad testified that after Jean-Louis spoke with Eden, Jean-Louis handed Hadad the car key and exited the vehicle. ECF#90:127.

Jean-Louis claimed not to remember the call even though the records proved the call lasted more than one minute. ECF#92:76; ECF#90:16; ECF85-56:2. Instead, Jean-Louis testified that he gave Hadad the car key because Hadad pulled up his shirt to show Jean-Louis a gun. ECF#92:49. Jean-Louis said he was afraid of being

hurt because "I don't know what he's going to do with that gun because he's kind of, like, showing it to me. So in my head, I'm, like, well, let me just give him the car key." ECF#92:50. Hadad denied showing Jean-Louis the gun. ECF#90:128.

Hadad and Jean-Louis both testified that Hadad returned Jean-Louis' house key, which was on the same keychain as the car key, and allowed Jean-Louis to gather his belongings from the car. ECF#92:52; ECF#90:127. Yarin arrived to help finalize the repossession, and Jean-Louis recognized Yarin from Guru. ECF#92:53. Jean-Louis testified that he saw the gun again when Hadad raised his arm while talking on the phone. ECF#92:52.

Jean-Louis testified that he did not "have any idea [what] was going on" and called the bank to see if he had missed any payments. ECF#92:54. Jean-Louis called his friend, who said to call 911. ECF#92:54-55. On the recorded 911 call, Jean-Louis said he knew Hadad was from the dealership and that Jean-Louis had "just missed prolly like four days of payment[.]" ECF#85-3:1.

When the police arrived, Hadad was sitting in the BMW. ECF#92:56. Hadad assumed someone from Guru called to make a report so the Honda would not be marked stolen. ECF#90:130. Instead, the police were there to arrest Hadad.

### C. Dismissal of the Florida State Case.

Hadad was initially charged in state court. At his deposition, Jean-Louis admitted that Guru called to tell him that his first payment did not go through *and*

*that the car would be repossessed* if he didn't make a payment. ECF#121-5:29-30. Jean-Louis also testified that he wasn't sure whether Hadad flashed the firearm intentionally or accidentally, and that he first saw the firearm *after* he had given Hadad the car key, when Hadad raised his arm to open the trunk. ECF#121-5:62-63.

The state prosecutor dismissed the case, stating in a Closeout Memorandum that Jean-Louis' deposition testimony "*negated the criminal intent* necessary to constitute an armed carjacking." ECF#121-7. Nevertheless, the federal government indicted Hadad for carjacking (Count 1) and brandishing a firearm in furtherance thereof (Count 2).

## STANDARDS OF REVIEW

Denial of a motion for judgment of acquittal is reviewed *de novo*. *U.S. v. Gamory*, 635 F.3d 480, 496 (11th Cir. 2011).

Challenges to jury instructions are reviewed *de novo*. *U.S. v. Grigsby*, 111 F.3d 806, 814 (11th Cir. 1997). Where the error is the omission of an element of the offense, the Court will reverse unless it can be shown that the error was harmless beyond a reasonable doubt. *U.S. v. Ruan*, 56 F.4th 1291, 1296-97 (11th Cir. 2023).

Evidentiary rulings are reviewed for abuse of discretion. *U.S. v. Tokars*, 95 F.3d 1520, 1530 (11th Cir. 1996).

Errors not raised at trial are reviewed for plain error. The defendant must show that there is (1) error that (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *U.S. v. Monroe*, 353 F.3d 1346, 1349-50 (11th Cir. 2003).

In reviewing a claim of cumulative error, the total prejudicial effect of the trial errors must be weighed *de novo* to determine whether reversal is warranted. *U.S. v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007).

Interpretation and application of the guidelines are reviewed *de novo*; factual findings at sentencing are reviewed for clear error. *U.S. v. Maddox*, 803 F.3d 1215, 1220 (11th Cir. 2015). The application of law to facts at sentencing is reviewed *de novo*. *U.S. v. Sjeklocha*, 114 F.3d 1085, 1087 (11th Cir. 1997).

## SUMMARY OF THE ARGUMENT

In the typical carjacking case, victims are shot, maimed, stabbed, beaten, their children attacked, their homes invaded, or they are subjected to other painful and violent conduct. Hadad did none of that. He repossessed a car without threats or violence. Particularly given the jury's special interrogatory finding that Hadad did not brandish the gun, the evidence was insufficient to prove that Hadad took the car by intimidation and with specific intent to kill or harm, and a judgment of acquittal should have been granted.

The district court misinterpreted the carjacking statute as not requiring that the defendant *subjectively* intended to cause death or serious bodily harm. Instead, the court instructed the jury that Hadad's specific intent is *only* "judged *objectively*" from the perspective of "what someone in the victim's position might reasonably conclude." The court erroneously ruled that Hadad's actual intent was irrelevant, precluding Hadad from testifying about his actual motive and intentions and excluding other exculpatory evidence.

Convicted of a non-violent repossession under a misinterpretation of the carjacking statute, the district court imposed a procedurally flawed and substantively unreasonable sentence of 96 months by wrongly relying on acquitted conduct (brandishing a firearm), contrary to the sentencing guidelines and in excess of the government's requested sentence.

## ARGUMENT

### I. HADAD'S CARJACKING CONVICTION FOR ATTEMPTING TO REPOSSESS A VEHICLE FROM A DEBTOR IN DEFAULT SHOULD BE REVERSED, PARTICULARLY GIVEN THE SPECIAL VERDICT FINDING THAT HADAD DID NOT BRANDISH A FIREARM AND THE LACK OF EVIDENCE THAT HADAD INTENDED TO CAUSE DEATH OR SERIOUS BODILY HARM TO THE OCCUPANT OF THE VEHICLE WHOM HADAD DID NOT THREATEN OR TOUCH.

Carjacking (18 U.S.C. § 2119) is a specific intent crime. *Holloway v. U.S.*, 526 U.S. 1, 9, 11 (1999). It requires proof beyond a reasonable doubt that a defendant (1) with the intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped, or received in interstate commerce (4) from the person or presence of another (5) by force and violence or intimidation. *U.S. v. Diaz*, 248 F.3d 1065, 1096 (11th Cir. 2001).

At the close of the evidence, Hadad moved for a judgment of acquittal, arguing that the government failed to prove Hadad's specific intent to kill/harm Jean-Louis. The court stated: "[T]he witness' testimony was that the moment he saw the gun, he was in fear. So we'll have to look at the evidence in that light. So we'll deny the motion." ECF#92:158.

Following the jury's acquittal on Count 2 (18 U.S.C. § 924(c)) and its special interrogatory as to Count 1 (carjacking) finding no brandishing, Hadad renewed his motion for judgment of acquittal as to carjacking, arguing that the remaining evidence was insufficient to prove specific intent to kill/harm. ECF#98.

In a written order, the district court "agree[d] that the jury made a factual finding that the Government did not prove beyond a reasonable doubt that Hadad brandished a firearm during and in relation to the carjacking," and therefore would "evaluate the remaining evidence to assess whether a juror could reasonably conclude that the Government proved an intent to kill or seriously harm the victim." ECF#131:7. But the court held that "seven actions taken by Hadad in carrying out a carjacking" were "sufficient evidence for a jury to conclude that Hadad had demonstrated the intent to inflict serious bodily harm." ECF#131:8. The seven actions included:

1. "staking out [Jean-Louis'] home the morning of the incident,"
2. "following [Jean-Louis] so closely on the highway that [Jean-Louis] detected he was being followed,"
3. "ripping the tag off [Jean-Louis'] car,"
4. "shouting 'Get out of the fucking car[,] Give me the car keys,'"
5. "continuing to follow [Jean-Louis] to [the Tri-Rail],"
6. "that [Jean-Louis] had cost Hadad's business money," and
7. "that Hadad did not have a license to repossess the car, nor any legal right to the car."

*Id*.

These actions are insufficient to prove that Hadad "(1) with the intent to cause death or serious bodily harm (2) took a motor vehicle … (5) by force and violence or intimidation." *Diaz*, 248 F.3d at 1096.

The evidence was undisputed that Hadad did not use "force or violence" to take the Honda. Hadad never threatened physical violence and made no physical contact with Jean-Louis—never touched him. Hadad never attempted to open the driver-side door, reach into the car, or physically remove Jean-Louis from the car. Hadad's actions, even when combined with his verbal demands that Jean-Louis get out of the car, were not inherently violent.

Nor did Hadad's seven "actions" rise to the level of "intimidation" required by the statute. "The term 'by intimidation' in the carjacking statute cannot be read in isolation, but must be considered along with the requisite intent, which means the intimidating act was conducted 'with the intent to cause death or serious bodily harm.'" *Ovalles v. U.S.*, 905 F.3d 1300, 1304 (11th Cir. 2018). "Given that required specialized intent, the carjacker's intimidating conduct must be to say or do something that makes an ordinary person in the victim's position fear serious bodily injury or death." *Id.*; *see also* 11th Cir. Pattern Jury Instruction (Criminal) O78. The Eleventh Circuit has held that the intimidation element necessarily entails at least threatened or attempted force. *Ovalles*, 905 F.3d at 1304; *In re Smith,* 829 F.3d 1276, 1280 (11th Cir. 2016).

Hadad did not use, attempt to use, or threaten to use physical force during the encounter with Jean-Louis. And, considering the evidence that (i) Jean-Louis *knew* he had missed his car payment, *see* 911 transcript, ECF#85-3 ("I just missed prolly like four days of payment[.]"), (ii) Jean-Louis had signed the Pre-Repo Agreement authorizing Guru's repossession of the car in the event of a default, ECF#17:47, and (iii) Hadad had texted Jean-Louis that morning to "Please call me ASAP to make payment, ECF#85-28, an "ordinary person" in Jean-Louis' position would not reasonably "fear serious bodily injury or death" because he should have expected that the car would be repossessed. *Ovalles*, 905 F.3d at 1304.

Even if there were sufficient evidence to establish "intimidation," that is insufficient to sustain a carjacking conviction; the government must additionally prove that the defendant had the specific intent to cause death or serious bodily harm if necessary to complete the taking. *Holloway*, 526 U.S. at 11. As instructed by the court, "serious bodily injury" means "physical harm that involves a substantial risk of death, extreme physical pain, obvious and long-term or permanent disfigurement, long-term or permanent loss or impairment of the function of a bodily member organ or mental faculty." ECF#90:199.

The seven actions are insufficient to prove specific intent to kill/harm, and neither the court nor the government cited any caselaw saying otherwise. As to the first action listed by the court—the so-called "staking out" of Jean-Louis'

apartment—Hadad went to Jean-Louis' apartment to locate the Honda for repossession; when Hadad saw the Honda parked outside, Hadad told his son Yarin to call a repossession towing company and Yarin told Hadad to "keep [his] eye on the car." ECF#90:122-23. There is no evidentiary basis for inferring that Hadad's intent and conduct to locate *the car* for repossession was "a calculated, targeted act *against the victim*," as the government argued below. ECF#103:9. Even when a thief intends to steal a car, loitering at the premises does not establish specific intent to kill/harm. *See U.S. v. Guerrero-Narvaez*, 29 F.4th 1, 15 (1st Cir. 2022) ("[T]here is no evidentiary basis…for inferring an intent to cause serious bodily harm or death from the defendants' loitering at the gas station with the motivation to steal the vehicle. The district court described this argument as 'nothing short of impermissible speculation…'").

The factors that Jean-Louis "had cost Hadad's business money" and "Hadad did not have a license to repossess the car nor any legal right to the car," ECF#131:8, are also insufficient to sustain the verdict. Hadad didn't own Guru—Yarin did. More importantly, a customer "costing the business money" is true in every repossession. This is hardly probative of intent to kill in a case where a car lot employee repossesses a car from a customer in default. And no incriminating inference about Hadad's intent can be drawn from the testimony that Hadad did not follow the government's expert's preferred protocol for a repossession. The absence of a

license or a dispute over whether Guru had the contractual right to repossess the car does not suggest Hadad possessed the specific intent to kill/harm.

Likewise, Hadad following Jean-Louis in his car, removing the paper tag, and shouting at Jean-Louis to get out of the car are insufficient under carjacking caselaw. In carjacking cases where the sufficiency of the specific intent element was sustained in the Eleventh Circuit and elsewhere, the defendant either used a weapon or employed forceful physical contact—in stark contrast to Hadad's conduct:[1]

- *U.S. v. Lumley*, 135 F.3d 758, 759-60 (11th Cir. 1998).
- *U.S. v. Kimble*, 178 F.3d 1163, 1166 (11th Cir. 1999).
- *U.S. v. Diaz*, 248 F.3d 1065, 1076-77 (11th Cir. 2001).
- *U.S. v. Fulford*, 267 F.3d 1241, 1243 (11th Cir. 2001).
- *U.S. v. Douglas*, 489 F.3d 1117, 1120-21 (11th Cir. 2007).
- *U.S. v. Baker*, 669 F. App'x 525, 526 (11th Cir. 2016).
- *U.S. v. Leon*, 713 F. App'x 948, 949 (11th Cir. 2017).
- *Ovalles v. U.S.*, 905 F.3d 1300, 1301-1303 (11th Cir. 2018).
- *U.S. v. Reed*, 778 F. App'x 654, 660 (11th Cir. 2019).
- *U.S. v. White*, 2023 WL 9016456, at *2-3 (11th Cir. Dec. 29. 2023).
- *U.S. v. Davis*, 109 F.4th 1320, 1325 (11th Cir. 2024).
- *U.S. v. Garcia-Alvarez*, 541 F.3d 8, 11-12 (1st Cir. 2008).

---

[1] Detailed parenthetical descriptions of the facts of these cases can be found in Appendix 1 to Hadad's Motion for Bond Pending Appeal, filed in the district court. ECF#150.

- *U.S. v. Lebron-Cepeda*, 324 F.3d 52, 57 (1st Cir. 2003).
- *U.S. v. Felder*, 993 F.3d 57, 62 (2d Cir. 2021).
- *U.S. v. Anderson*, 108 F.3d 478, 485 (3d Cir. 1997).
- *U.S. v. Green*, 664 F. App'x. 193, 199-200 (3d Cir. 2016).
- *U.S. v. Whitley*, 105 F.4th 672, 682 (4th Cir. 2024).
- *U.S. v. Frye*, 489 F.3d 201, 208 (5th Cir. 2007).
- *U.S. v. Mack*, 729 F.3d 594, 603-04 (6th Cir. 2013).
- *U.S. v. Adams*, 265 F.3d 420, 423-25 (6th Cir. 2001).
- *U.S. v. Hunter*, 932 F.3d 610, 623 (7th Cir. 2019).
- *U.S. v. Carter*, 695 F.3d 690, 690 (7th Cir. 2012).
- *U.S. v. Dean*, 810 F.3d 521, 529 (8th Cir. 2015).
- *U.S. v. Frank*, 292 F. App'x 618, 620 (9th Cir. 2008).
- *U.S. v. Vallejos*, 421 F.3d 1119, 1124 (10th Cir. 2005).

Undersigned could not locate any case finding specific intent to kill/harm absent active use of a weapon, physical force/harm, or verbal threats of violence. Instead, two cases overturning carjacking convictions for insufficient evidence of intent to kill/harm illustrate that Hadad's conviction must be reversed.

In *U.S. v. Bailey,* the Fourth Circuit found insufficient evidence where the defendant jumped in the backseat of a truck, pressed something cold and hard against the driver's neck, and stole the truck after the driver abandoned it in fear. 819 F.3d 92, 95 (4th Cir. 2016). The driver did not see a weapon and was not sure what the

object was, but "he believed that Bailey was about to kill him" so he jumped out of the truck. *Id*. Bailey fled in the truck, driving 60mph during a police chase, then jumped from the truck and fled on foot. *Id*.

The Fourth Circuit found this evidence insufficient, pointing to a line of carjacking cases where "the evidence of intent was much stronger than the evidence presented to the jury regarding Bailey's state of mind." *Id*. (collecting cases). The court reasoned that cases finding specific intent involved defendants who "threatened their victims with actual weapons, made affirmative threatening statements, and/or physically assaulted their victims." *Id*. at 97. The court held "Bailey's panicked state and reckless driving to evade police clearly evidenced his carelessness and desperation, and he obviously placed his initial passengers and countless pedestrians in harm's way, but this was insufficient for the purposes for which it is proffered here…." *Id.* at 98. The court concluded with "no hesitation" that "evidence of generalized recklessness and desperation, coupled with an unconsummated implied threat or 'bluff' provided insufficient evidentiary support" to "reasonably find beyond a reasonable doubt" specific intent to kill or seriously harm the truck driver. *Id*. at 98.

In *Guerrero-Narvaez*, the First Circuit affirmed a judgment of acquittal where Guerrero-Narvaez approached a mother ("Silva") at a gas station and said he "was sent" to "take [her] vehicle," but promised not to harm her or her children who were

in the car if she cooperated. 29 F.4th at 6. Guerrero-Narvaez touched his shirt in a "sort of intimidating" manner, which Silva took to mean he was armed, though Guerrero-Narvaez never displayed a weapon. *Id*. Guerrero-Narvaez let Silva remove her children and helped her gather her belongings from the trunk before driving off. *Id*.

The First Circuit rejected the government's argument that in the absence of a weapon or evidence of force, Guerrero-Narvaez's intent to kill/harm could be inferred from five trial facts: his large size; that he, not his smaller co-defendant, committed the taking; Guerrero-Narvaez's arrival on foot; his constant "following" of Silva; and the nature of his threat. *Id*. at 7. The court held Guerrero-Narvaez's conduct fell "far from the line we have drawn in prior cases," *id*. at 16, and the "ambiguity of the evidence of a weapon and the lack of evidence indicating that Guerrero-Narvaez used any other type of force to achieve the taking of Silva-Rivera's vehicle, in combination with the other, equivocal evidence on which the government relies, dooms the government's case…." *Id.* at 16. The court concluded: "Whereas *Diaz-Rosado* was 'close,' 857 F.3d at 121, the facts of this case make it, as the district court aptly noted, 'a ten-mile-long shot' even considering the deferential standard owed to jury verdicts." *Id.; compare U.S. v. Diaz-Rosado,* 857 F.3d 116, 121-22 (1st Cir. 2017) (finding "the case is close" but affirming conviction where unarmed defendant attacked grandmother buckling grandchild into car seat,

wrestled car keys from her, struggled with her to seize car, pushed and shoved her onto cement sidewalk, and drove away while she was still pulling grandchild from car).

If *Guerrero-Narvaez* was, in the First Circuit's words, "a ten-mile-long shot," then Hadad's case is a 26.2-mile marathon from establishing specific intent to kill/harm. Nor was there conditional intent: Despite Jean-Louis' multiple acts of defiance in rebuffing Hadad's demands and refusing to surrender the car at the red light and later at the Tri-Rail station, Hadad still did not "attempt[] to seriously harm or kill [Jean-Louis]…to complete the taking of the car." *Holloway*, 526 U.S. at 12. Even according to Jean-Louis: "as [Hadad] was telling me to get out of the car, he told me to call the dealership and things like that." ECF#92:89-90. And when Jean-Louis *confronted Hadad*, ECF#92:48, Hadad still did not respond with violence, threats, or physical force.

The evidence also showed that when Hadad took possession of the car, he did not rush off, as a thief would. Instead, Hadad returned Jean-Louis' house keys, allowed Jean-Louis to gather his belongings, and waited for a tow truck to complete the repossession. ECF#90:129. A police officer testified that he had never encountered a carjacking where the suspect remained on the scene with the car. ECF#90:11. These undisputed facts reflect that Hadad had no intention to kill/harm Jean Louis. This Court should enter a judgment of acquittal.

## II. HADAD IS ENTITLED TO A NEW TRIAL BECAUSE THE DISTRICT COURT ERRONEOUSLY INSTRUCTED THAT HIS SUBJECTIVE INTENT WAS "IRRELEVANT" AND IMPROPERLY EXCLUDED HIS TESTIMONY AND OTHER EXCULPATORY EVIDENCE REGARDING HIS LACK OF SPECIFIC INTENT TO CAUSE DEATH OR SERIOUS BODILY HARM.

In response to a government motion, ECF#28, the magistrate judge ruled that Hadad could not testify that he believed he could lawfully repossess the Honda, ECF#62:6, or that his intention was to locate the car in order to repossess it, not steal it, or that he had no intention to kill or harm Jean-Louis. ECF#62:6. Relying on *U.S. v. Guilbert*, 692 F.2d 1340, 1344 (11th Cir. 1982), and *Shaffer v. U.S.*, 308 F.2d 654, 655 (5th Cir. 1962), the magistrate judge ruled that Hadad's "subjective undisclosed intent is *not relevant* to the jury's calculus on the question of intent to cause death or serious bodily harm" and "such evidence of 'self-help' is irrelevant to the issue of Defendant's *mens rea*." ECF#62:6-7 (emphasis added).

By the time Hadad took the stand, the government had called a repossession expert who testified about the steps for repossessing a car under Florida law. The government sought to establish that this case "[is] not based on repossession, we were showing that this was not a repossession that it was a taking." ECF#90:87. As the government told the jury in opening statement: "There was no repossession here. This was a carjacking…this wasn't a repossession…this defendant had no right to

that car…this was a straight-up taking…this defendant carjacked that car." ECF#92:24.

At sidebar as Hadad was about to testify, the government argued that "Mr. Hadad cannot refer to…repossession, that is why we want the supplemental instruction, we just want to make clear that *he cannot say I was there doing a repossession as a statement about what was in his mind because it's not relevant*." ECF#90:112 (emphasis added). Hadad's counsel responded that "the defense has to be able to show why [Hadad] was there. It wasn't like he was staking him out to steal a car at gunpoint. There's a reason for him to be there and that reason is important." ECF#90:112; *see also* ECF#90:87 (HADAD'S COUNSEL: "[I]f Mr. Hadad gets on the stand, it's what his mental state was at the time." AUSA: "It's not. In fact, the law is very clear that that's irrelevant").

Hadad's counsel pressed on, telling the court that Hadad should be allowed to testify about his non-criminal intent to repossess the car. ECF#90:112. The government said that under the magistrate judge's order, Hadad could not use "the repossession" to "argue that he was not taking the car and that he did not satisfy the intent element because there's no intent element and that *it's not relevant for purposes of his intent as to commit serious bodily injury*…If he wants to testify that he went up to Mr. Jean Louis and he said, I'm here to do a repossession, that would be different because that's the effect on the victim. That's the victim's knowledge.

*Where if he says, I was just going to do a repossession, of course I wasn't going to hurt this guy, then that would be very different because it's from the victim's perspective based upon objective circumstances, it's not based upon his secret motive for why he was doing it*. This is specifically quoting from *Guilbert*." ECF#90:112-113 (emphasis added).

The court asked if the government objected to Hadad testifying that he was there to repossess the car, to which the government said no, "[b]ut he just can't go to, then he says, well, I was just there to repossess the car, therefore, you know, I couldn't have possibly wanted to, you know, commit harm to someone or something like that." ECF#90:114. Hadad started to testify that he did not threaten Jean-Louis, and had no intent to harm or scare him, but that line of questioning ended when the court sustained the government's objection. ECF#90:130.

Consistent with the curtailment of Hadad's testimony, over objection, the court gave the government's modified pattern jury instruction on specific intent:

> [Pattern:] To decide whether the Defendant "intended to cause death or serious bodily harm," you must objectively judge the Defendant's conduct as shown by the evidence and from what someone in the victim's position might reasonably conclude.
>
> [Addition:] For that reason, the Defendant's intent is not to be measured by any secret motive or undisclosed purpose merely to frighten, not to hurt, but rather is to be judged objectively from his conduct. You should also not consider the Defendant's motivation when deciding whether he 'took or attempted to take a motor vehicle,' because his motivation is not relevant to that element either.

ECF#72; ECF#90:154-56; ECF#90:198. And the court warned Hadad's counsel not to talk about Hadad's subjective intent in closing: "[T]o the extent that you may want to argue or get into the subjective intent,…[i]t's inconsistent with the Court's instruction on the law." ECF#90:156.

The government capitalized on the modified instruction, telling jurors in closing that "whether the defendant intended to cause serious bodily injury or death,…although it may seem about what the defendant was thinking, *the definition by law is what the victim would think the defendant was thinking*." ECF#90:165 (emphasis added). The government repeated that Hadad's motivation for taking the car was not relevant, and that Hadad's testimony about his own intent "does not matter." *Id*. The government then admonished the jurors that "[t]o consider it would actually violate the legal instruction of the Court. The legal instruction of the Court is we look objectively at the victim's perspective, about what they would think was happening." ECF#90:164-65. And that to determine whether "the defendant intended to cause serious bodily harm when he took the car," jurors must "judge from the objective perspective of the victim." ECF#90:168.

Hadad's counsel tried to explain to the jury that Hadad did not "have the intent to do some type of harm, death or serious bodily harm to Jean-Louis at the time that this incident happened…He didn't even think he was doing anything wrong," but the government's objection was sustained. ECF#90:182-83. When Hadad's counsel

said, "Hadad did not believe he was committing a crime," the government objected and, in the jury's presence, the court stated: "Sustained. *His intent we've already discussed is irrelevant*." ECF#90:182, 183 (emphasis added).

During deliberations, the jury sent the following question:

> Please clarify if for Element 4 of Count I, "intended to cause death or serious bodily harm," applies to the victim's conclusions and feelings on 12/19/23, or does it only take into account the defendant's actions and how someone in the victim's position might reasonably conclude.

ECF#77. The court did not tell the jury that they must find Hadad's subjective intent; instead, the court reread the opposed, modified instruction, ECF#90:206-9, and the jury convicted Hadad of carjacking about an hour later.

### A. The Modified Jury Instruction Erroneously Relieved the Government of Proving Hadad's Intent.

The jury instruction was prejudicial error because it told jurors that Hadad's actual intent was irrelevant, an incorrect statement of the law that runs counter to the express language of the carjacking statute and *Holloway*. Although the "whoever…takes…by force and violence or intimidation" element may be judged objectively based on the driver's experience, the "with the intent to cause death or serious bodily harm" element is judged subjectively—based on what the defendant actually intended at the moment of the taking—not merely what the victim thought or felt.

The Supreme Court made clear in *Holloway* that "[t]he statute's mens rea component…*directs the factfinder's attention to* *__the defendant's state of mind__* at the precise moment he demanded or took control over the car 'by force and violence or by intimidation.'" 526 U.S. at 8. Further, "Congress' *inclusion of the intent element* requires the Government to prove beyond a reasonable doubt that *the defendant would have at least attempted to seriously harm or kill the driver* if that action had been necessary to complete the taking of the car." 526 U.S. at 11-12 (emphasis added).

The government relied on *Guilbert* and *Shaffer*—two cases pre-dating *Holloway*—to persuade the district court that a defendant's actual intent is irrelevant and inadmissible *at trial*. But neither case addressed the relevance of evidence, much less whether the jury should be instructed that the defendant's actual intent is irrelevant. Rather, this Court was reviewing, post-verdict, whether the evidence already admitted at Guilbert's and Shaffer's trials was sufficient to sustain their convictions. Those cases addressed the sufficiency, *not the relevance or admissibility*, of the evidence.

In that procedural posture, the Eleventh Circuit held that to determine "whether there is sufficient evidence to support the finding that the defendant had the requisite intent," *Shaffer*, 308 F.2d at 655, the evidence "is not to be measured by the secret motive of the actor or some undisclosed purpose merely to frighten, not

to hurt. This is to be judged objectively from the visible conduct of the actor and what one in the position of the victim might reasonably conclude." *Shaffer*, 308 F.2d at 655; *Guilbert*, 692 F.2d at 1342. Applying that standard, the Eleventh Circuit found sufficient evidence that the defendants intended to cause serious harm: Shaffer was an inmate who tried to escape by loading a shotgun in front of others and threatening that "he would shoot their heads off"; Guilbert threatened to kill a bar manager, hit him in the face, and then cut him with broken beer bottle and beat him with pool stick. *Shaffer*, 308 F.2d at 655; *Guilbert*, 692 F.2d at 1342. Neither case held that evidence of a defendant's motive should be excluded, much less that the jury should be instructed to disregard the defendant's subjective intent.

In formulating the jury instructions during Hadad's trial, the district court was not being asked to evaluate the *sufficiency* of already-admitted evidence, but rather the *relevance* of Hadad's proffered evidence regarding his state of mind. Still, the government urged the court to exclude the evidence bearing on Hadad's intentions, including prohibiting Hadad from explaining his intentions and state of mind at the time he obtained the car from Jean-Louis. Where intent was hotly contested and a feature of the trial, excluding that evidence and Hadad's own testimony, combined with the erroneous jury instruction, was prejudicial error.

The court first gave the pattern instruction that "to decide whether the Defendant 'intended to cause death or serious bodily harm,' you must objectively

judge the defendant's conduct as shown by the evidence and from how someone in the victim's position might reasonably conclude." The court then added the *Guilbert* and *Shaffer* sufficiency-of-the evidence language that "the Defendant's intent is not to be measured by any secret motive or undisclosed purpose merely to frighten, not to hurt, but rather is to be judged objectively from his conduct." *Id.*

The court read the next added sentence, purporting to address the taking element of the statute: "You should ***also*** *not consider the Defendant's motivation* when deciding whether he 'took or attempted to take a motor vehicle,' *because his motivation is not relevant to that element* ***either***." But by using the words "*also* not consider" and "not relevant to that element *either*," this instruction told the jury that Hadad's actual mental state and motive for his actions was "not relevant" to *either* the taking element or the specific intent element of the offense, entirely erasing the requirement that the government prove "the statute's mens rea component[, which] modifies the act of 'tak[ing]' the motor vehicle [and] directs the factfinder's attention to the defendant's state of mind at the precise moment he demanded or took control over the car 'by force and violence or by intimidation…'" *Holloway*, 526 U.S. at 8. Even if the jury believed that Hadad never intended to kill or harm Jean-Louis, this instruction directed the jury to convict him based solely on what "someone in the victim's position might reasonably conclude." This Court cannot allow such a

conviction to stand. To the extent that *Guilbert* and *Shaffer* held otherwise, those cases were abrogated by *Holloway*.

Treating specific intent as a purely objective inquiry contradicts longstanding principles that criminal liability generally does not turn on how a reasonable person would interpret a defendant's conduct but rather on what the defendant *actually intended*. In *Elonis v. U.S.*, the Supreme Court invalidated a conviction for making threatening communications under 18 U.S.C. § 875(c) because "[t]he jury was instructed that the Government need prove only that a reasonable person would regard Elonis's communications as threats, and that was error. Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state." 575 U.S. 723, 740 (2015). Just as the government argued in Hadad's trial, the prosecution told Elonis's jury "that it was irrelevant whether Elonis intended the postings to be threats," because "*it doesn't matter what he thinks*." *Id*. at 732; *compare* ECF#90:166 (prosecution telling jurors in closing that "it doesn't matter why [Hadad] did it, it matters what Schneider would think").

Not so, the Supreme Court said: "Having liability turn on whether a 'reasonable person' regards the communication as a threat—regardless of what the defendant thinks—reduces culpability on the all-important element of the crime to negligence, and we have long been reluctant to infer that a negligence standard was intended in criminal statutes." *Id*. at 738 (citations omitted). The same reasoning

applies here, where the government told Hadad's jury that Hadad's actual, subjective intent "does not matter" and that "although it may seem about what the defendant was thinking, the definition by law is what the victim would think the defendant was thinking." ECF#90:165.

In *Ruan v. U.S.*, the Supreme Court analyzed the *mens rea* requirement of 21 U.S.C. § 841 after two doctors appealed their convictions for dispensing controlled substances not "as authorized." 597 U.S. 450, 454 (2022). The Court considered "the state of mind that the Government must prove to convict these doctors of violating the statute," and ultimately held: "the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Id*.

The government offered "a substitute mens rea standard," arguing that "rather than simply apply[ing] the statute's 'knowingly or intentionally' language to the authorization clause, [the Court] should read the statute as implicitly containing an 'objectively reasonable good-faith effort' or 'objective honest-effort standard,'" allowing the government to convict a defendant "by proving beyond a reasonable doubt that [the defendant] did not even make an objectively reasonable attempt to ascertain and act within the bounds of professional medicine." *Id*. at 465.

The Court rejected this argument, noting first § 841 "uses the familiar *mens rea* words 'knowingly or intentionally,'" and "nowhere uses words such as 'good

faith,' 'objectively,' 'reasonable,' or 'honest effort," and second, "the Government's standard would turn a defendant's criminal liability on the mental state of a hypothetical 'reasonable' doctor, not on the mental state of the defendant himself." *Id.* at 465. On remand, this Court reversed Ruan's conviction, holding that "a properly instructed jury may not have convicted the defendants had it known that Ruan's and Couch's subjective beliefs that they were acting properly was a defense to these charges." *U.S. v. Ruan*, 56 F.4th 1291, 1298 (11th Cir. 2023).

In Hadad's case, the court instructed Hadad's jury that the separate "intimidation" element of carjacking is evaluated objectively: "[t]o take 'by intimidation' is to say or do something that would make an ordinary person fear bodily harm." ECF#90:198. By instructing the jury to evaluate both the "intimidation" and the "intent to cause death/serious harm" elements from the perspective of the "ordinary person," the district court conflated the two elements into a single, objective inquiry. This altogether eliminated the separate and elevated *mens rea* that Congress and *Holloway* require to prove specific intent, a defendant-centered inquiry requiring the jury to evaluate what the defendant actually intended—not merely how his actions appeared. *Holloway*, 526 U.S. at 11. To the extent that the Eleventh Circuit pattern instruction limits the jury to only an objective inquiry to decide the defendant's intent, it is wrong and should be redrafted consistent with *Holloway*.

Given the jury's question on the intent element, the instructional error was definitely, not merely "probably[,] responsible for an incorrect verdict." *U.S. v. Whyte*, 928 F.3d 1317, 1331-32 (11th Cir. 2019). It is "difficult to imagine an issue more central to a finding of criminal responsibility than mens rea. If the government can't prove that the defendant acted with the requisite state of mind, the defendant is entitled to an acquittal." *U.S. v. Bush*, 110 F.4th 1246, 1253 (11th Cir. 2024).

**B. Hadad Should Have Been Permitted to Testify About His Lack of Intent to Kill/Harm.**

The Due Process, Confrontation, and Compulsory Process Clauses of the Fifth and Sixth Amendments guarantee the "right to present a defense, the right to present the defendant's version of the facts," *Washington v. Texas*, 388 U.S. 14, 19 (1967), and "to present his own version of events in his own words." *Rock v. Arkansas,* 483 U.S. 44, 52 (1987); *U.S. v. Scott*, 909 F.2d 488, 491 n.1 (11th Cir. 1990). Precluding Hadad from providing full-throated testimony about his intent was reversible error.

Criminal intent was the most contested element at trial, as Hadad did not deny many of the underlying facts. Hadad's defense centered on his non-criminal purpose and motive—repossession, not robbery. But the government persuaded the Court to curtail this defense, even as the government argued to the jury that Hadad "had zero right to this car, this was a straight-up taking…this defendant carjacked that car." ECF#92:24. And the government called a repossession expert to opine that someone

who repossesses a car without legal entitlement is a thief "stealing" the car.[2] ECF#90:41.

The prejudice was magnified when, over objection, the prosecutor accused Hadad and his son Eden of being thieves who intended to steal the car from Jean-Louis. ECF#90:102. ("Q by AUSA: Even though you did not have a legal right to his car, you were intending to steal it from him, correct? HADAD'S COUNSEL: Objection to that terminology. THE COURT: Overruled. BY AUSA: Q. Is that yes, sir? A. By EDEN: Not to steal from him, not to steal the vehicle. Q: You were going to take it? A: Correct, to repossess the vehicle. Q: Without a legal right. You were going to take it without a legal right.").

The government capitalized on all this testimony, portraying Hadad as a thief with no lawful purpose and telling the jury that Hadad "had no legal rights and calling it a repossession doesn't make it so. It's a robbery of a car every day of the week and that is carjacking." ECF#90:172. The government was therefore able to

[2] This testimony was improper under Fed. R. Evid. 704(b), which prohibits an expert from stating an opinion about a defendant's mental state that constitutes an element of the crime charged, and this Circuit has suggested that such testimony constitutes plain error. *Cf. U.S. v. Graham*, 123 F.4th 1197, 1262 (11th Cir. 2024) (finding no plain error because the conclusion of the expert was "not a matter involving scienter"). While the expert "never spoke [Hadad's] name," he violated 704(b) by concluding Hadad "was part of a group of people that all have a particular mental state." *Diaz v. U.S.*, 602 U.S. 526, 536 (2024). Hadad objected pretrial to this expert testimony under *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), ECF#46, but did not additionally object during trial.

use the arguments it had succeeded in keeping Hadad from rebutting in a one-sided narrative that painted Hadad as a thief without Hadad having an opportunity to respond.

In *U.S. v. Word*, this Court held that a defendant must be "afforded the opportunity to present evidence to counter the government's argument," particularly when the government's "trial strategy [makes a] defense highly significant." 129 F.3d 1209, 1212-13 (11th Cir. 1997). In *Word*, the government argued that the jury could infer that "[co-defendant] Dailey willfully and knowingly committed fraud because she was romantically involved with the man responsible for the fraudulent scheme's creation—Calvin Word." *Id.* at 1211. The government relied on this romantic-involvement theory during trial and closing. But Dailey was precluded from testifying "that Word physically and emotionally abused her and...did not share much information with her." *Id*. at 1212. The Eleventh Circuit held that Dailey was entitled to a new trial where she could offer evidence to counter the government's theory of prosecution: "the government was able to argue inferences favorable to the prosecution based upon the romantic relationship between the two co-defendants while the defendant, Dailey, was prohibited from introducing evidence that told a different story about the relationship and that might have contradicted or undercut those inferences." *Id*. "Because the government's strategy made the romantic relationship significant, that exclusion amounted to an abuse of discretion and a

reversible error." *Id.*; *see U.S. v. Knowles*, 889 F.3d 1251, 1257-58 (11th Cir. 2018) ("In the law, what's sauce for the goose is normally sauce for the gander").

Like the defendant in *Word*, Hadad is entitled to a new trial because the district court's rulings "prohibited [him] from introducing evidence that told a different story" that "contradicted or undercut" the government's theory of the case. *Word,* 129 F.3d at 1213.

### C. Hadad Should Have Been Permitted to Present Evidence that the Occupant Knew the Vehicle was Subject to Repossession.

Citing Rules 404 and 608, Fed. R. Evid., the court excluded, over objection, evidence that Jean-Louis had a prior repossession. ECF#62:10-11. This was error. First, the prior repossession showed that Jean-Louis' claimed fear during the incident was not objectively reasonable—he knew that repossession was a foreseeable consequence of defaulting on a car loan. Second, evidence of the prior repossession would have undermined Jean-Louis' claim that he did not know "why this all happened." Finally, excluding the prior repossession allowed the government to characterize the car loan as a "predatory loan," ECF#90:21, which was inflammatory and false.[3] Hadad should have been permitted to explain that the high interest rate,

[3] Hadad's trial counsel failed to object to this remark. To the extent that such failure was ineffective assistance of counsel, Hadad intends to raise this claim in a post-conviction proceeding, 28 U.S.C. § 2255, if this appeal is unsuccessful.

which was determined by Mid-Atlantic and not Guru, was based on Jean-Louis' credit risk and prior repossession, not on exploitative conduct by Hadad or Guru.

The court also excluded the Pre-Repo Agreement that Jean-Louis signed when he bought the car, which Hadad tried to introduce to rebut the government's arguments that Hadad was a thief with no right to take the car and was just stealing it. As the highlighted language in the Agreement makes clear, Jean-Louis affirmed that Guru was *"authorized by me and ha[s] the right to take said automobile back from me* without the necessity of court order or any judicial process," if Jean-Louis defaulted on his loan payments. ECF#17:47.

I hereby agree that in the event that I fail to make any payment or any part of any payment on my loan from you,
Loan No: 4504 for Year: 2020 Make: Honda Model: Accord
VIN: [redacted]A122934.

You are authorized by me and have the right to take said automobile back from me, without the necessity of court order or any judicial process. I further agree that if it becomes necessary for you to take said automobile back, you are permitted to do so at any time of the day or night and may enter and remove said car from my property or any other property where I may leave said car. I also give you permission to use any reasonable means to open or gain entry into said car without causing any undo damage in the process of taking it back.

I understand that should it become necessary for you to take back said car and I redeem same by making full payment to you. This payment will include any of your costs for taking back the car including a minimum repossession fee of $________.

I agree that I will not keep any personal property of any great value in said automobile during the term of this loan, but in the event I do, I assume any and all responsibility for any personal property left in the car by me or by other persons, should that property be lost or missing for any reason from said car after it has been taken back by you and stored in a reasonably safe place. I agree that you are not required to give me any notice before you take back said car, and that my failure to make any payment on time according to my loan contract, will be my notice that you have the right to take back the automobile.

I understand that I have the right to have this agreement examined by my attorney if I desire, before I sign it.

JEAN LOUIS SCHNEIDER
Buyer Name

Buyer Signature

10/11/2023
Date

Relying on *Guilbert* and *Shaffer*, the magistrate judge ruled pretrial that "*this agreement should not be admitted for the purpose of negating criminal intent*." ECF#62:7-8. At trial, the Agreement was excluded entirely following the government's objection that if the Agreement was coming into evidence, Hadad's counsel could only argue that the Agreement existed and that it was signed, because "the pretrial ruling is clear that [Hadad] cannot get up there and say that he was out to do a repossession...." ECF#90:86-87. After further argument, the Agreement was excluded entirely.[4] ECF#90:88.

The government painted Hadad as a thief who stole the car from Jean-Louis and used the expert's opinion to bolster this; the prosecutor acknowledged that "we

---

[4] After a lengthy discussion at sidebar on the admissibility of the document, the following exchange took place:

> THE COURT: Well, then, we'll just exclude the exhibit entirely.
> HADAD'S COUNSEL: Okay. Exclude the exhibit entirely. I mean –
> THE COURT: Exclude it entirely?
> HADAD'S COUNSEL: Yeah.
> THE COURT: Okay. That's fine.

ECF#90:88. If Hadad's counsel's acquiescence caused the wholesale exclusion of the Agreement, counsel's capitulation was not strategic, much less authorized by Hadad. To comply with this Court's order denying leave to exceed Rule 32's word limitation, Doc.31, Hadad has omitted from this brief the ineffective assistance of counsel claim that was included in the proposed, oversized brief, Doc.21:54-61, which can be raised in a post-conviction proceeding pursuant to 28 U.S.C. § 2255, if this appeal is unsuccessful.

were showing [with the expert's testimony] that this was not a repossession, that it was a taking." ECF#90:87. Hadad was entitled to put on evidence that he believed the repossession was proper and that Jean-Louis had *consented* to the supposed "taking" by signing the Pre-Repo Agreement. *See Word*, 129 F.3d at 1212-13. Together with Jean-Louis' prior repossession, the Pre-Repo Agreement was also admissible to rebut the government's arguments that Jean-Louis was terrified and did not know what was happening when Hadad told Jean-Louis to "call the dealership," ECF#90:161, and demanded the keys to the car.

The prejudice was compounded because, after the Pre-Repo Agreement was excluded, the government was free to exploit its absence during cross-examination of Hadad, undermining his credibility on the lawfulness of the repossession. The prosecutor asked Hadad, "So Guru Auto Sales, the dealership you worked for, had no legal right to that car that day?" Hadad tried to explain that he believed Guru had a right to repossess the car pursuant to the Pre-Repo Agreement, but the Agreement had been excluded from evidence, so the prosecutor told Hadad: "Mr. Hadad, I know you're referring to that document, but that's not in evidence." ECF#90:139. Hadad needed the Agreement to tell his story—without it, Hadad was left hamstrung in explaining his actions and was exposed to the government's cross-examination, painting him as not credible and having no admissible evidence to corroborate his testimony.

The combination of instructional error and exclusion of exculpatory evidence of Hadad's intent rendered Hadad's trial unfair requiring reversal. *Cf. Graham*, 123 F.4th at 1283 ("[t]he cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error").

## III. THE INDICTMENT SHOULD HAVE BEEN DISMISSED BECAUSE, AS A MATTER OF LAW, THE MOTOR VEHICLE, A SALVAGE WRECK THAT NEVER LEFT FLORIDA AFTER IT WAS REBUILT, LACKED A NEXUS TO INTERSTATE COMMERCE; ALTERNATIVELY, THE JURY, NOT THE JUDGE, SHOULD HAVE DECIDED THAT QUESTION.

Carjacking requires that the motor vehicle "has been transported, shipped, or received in interstate… commerce." 18 U.S.C. § 2119. To meet this element, the government presented evidence that the Honda was manufactured in Ohio and then transported to North Carolina. ECF#92:132.

Hadad proffered that the Honda was totaled in a car accident and Guru purchased it at an insurance sale in North Carolina as "salvage[,]…a motor vehicle…which is a total loss." Fla. Stat. § 319.30(1)(r); ECF#62:8. The salvage was shipped on a flatbed to Florida where it was rebuilt, issued a salvage title, then sold to Jean-Louis and never left Florida. ECF#62:8.

Relying on *U.S. v. Johnson*, 56 F.3d 947 (8th Cir. 1995), and *U.S. v. Gamble*, 939 F. Supp. 569 (E.D. Mich. 1996), Hadad argued in a motion to dismiss, ECF#17:11-13, and in a proposed jury instruction, ECF#56, that the car's nexus to interstate commerce had come to an end when it was totaled—before Guru acquired

it—and once rebuilt in Florida, the car remained exclusively intrastate, so the interstate commerce element could not be met. *See Johnson*, 56 F.3d at 956-57 (reversing carjacking conviction where car was assembled in Missouri and never left Missouri; rejecting government's argument that nexus to interstate commerce was satisfied because 95% of the car's parts were shipped to Missouri from another state); *Gamble*, 939 F. Supp. at 570-71 (dismissing carjacking count where car manufactured in Michigan never left Michigan).

The court denied Hadad's motion to dismiss, ECF#32; ECF#59, and granted the government's motion to exclude this salvage evidence as irrelevant. ECF#62:10. This was prejudicial error. For purposes of § 2119, the salvage ceased to qualify as a "motor vehicle" after the accident; the statute was intended to address the violent theft of operable vehicles, not of salvage that have no ability to move in interstate commerce. The salvage did not become a 'motor vehicle' again until it was rebuilt in Florida, prior to the events charged in the indictment. The district court should have dismissed the indictment for failure to allege/prove the interstate commerce element.

Alternatively, "whether the product at issue…has lost its interstate character is a question of fact for the jury," and evidence that the product no longer bore a connection to interstate commerce was "surely relevant." *U.S. v. Nukida*, 8 F.3d 666, 671-72 (9th Cir. 1993); *see also U.S. v. Tobin*, 576 F.2d 687, 691-93 (5th Cir. 1978);

(interpreting same requirement in § 2313 stolen vehicles case). The "interstate commerce issue constitutes a material element of the offense…and involves a factual determination going to the general issue of [defendant's] guilt or innocence." *Nukida*, 8 F.3d at 672. The district court should have dismissed the carjacking count or at least allowed the jury to hear the salvage evidence and decide the interstate commerce element.

## IV. HADAD'S 96-MONTH SENTENCE, WHICH EXCEEDED THE GOVERNMENT'S REQUEST FOR A BOTTOM-END GUIDELINE SENTENCE, WAS UNREASONABLE GIVEN THE LACK OF THREATS OR VIOLENCE, THE ACQUITTAL ON THE GUN COUNT, AND THE JURY'S SPECIAL INTERROGATORY FINDING THAT HADAD DID NOT BRANDISH THE GUN.

When sentencing a defendant, the court is must impose a sentence that is "sufficient but not greater than necessary" to meet the objectives delineated by Congress. 18 U.S.C. § 3553(a). Despite this mandate, the district court imposed a crushing sentence that exceeded even the government's draconian assessment of the "necessary" punishment for a non-violent (even if technically improper) repossession of a vehicle from a debtor in default.

### A. The Court Erred in Enhancing Hadad's Sentence Based on the Acquitted Conduct Involving the Firearm.

The Sentencing Guidelines provide: "if a firearm was brandished or possessed, increase by 5 levels." U.S.S.G. § 2B3.1(b)(2)(C). The court imposed this enhancement over objection. ECF#141:4-7.

By the time of Hadad's sentencing, the "acquitted conduct" amendment to the guidelines had taken effect. It provides: "Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." U.S.S.G. § 1B1.3(c) (effective 11-1-2024); *see U.S. v. Shanks,* 2025 WL 1621179 at *3 (11th Cir. Jun. 9, 2025) (recognizing the acquitted conduct amendment; holding court must apply version of guidelines in effect at sentencing).

Hadad argued that the firearm enhancement was precluded by the acquitted conduct amendment because Hadad was found not guilty of possessing or carrying a firearm during and in furtherance of the carjacking, and the jury found the government failed to prove brandishing. ECF#121:12-18. The court imposed the enhancement anyway, indicating it was not bound by the acquitted conduct amendment. The court also expressed disagreement with the verdict and injected a clearly erroneous factual narrative that Hadad had pointed the gun at Jean-Louis, something Jean-Louis never claimed, and the government never argued:

> THE COURT: …Relevant conduct for which a defendant was acquitted may be taken into account at sentencing for the offense of conviction… I understand that he was acquitted on that count. I don't think it should mean that I should disregard what I heard. To the extent a credibility assessment has to be made[,] I heard the victim's testimony. I found it should be credible. I respect the jury's verdict. I'm not questioning it. But I've got to make a determination on a different burden of proof. *And just because the jury made that determination is not binding on me when I have to make a credibility determination under a lower burden* of proof.

> …I know that stop on Le Jeune Road…I know the Tri-Rail station. *I know how this deal went down. Personally, I would have been scared to death. I would have thought -- and I have had a gun pointed at me. It's – you know, I mean, you are looking at your life in front of you. In Miami, when a guy shows up at your window pointing a gun at you,* I understand…
>
> …on what I heard, I'll note the objection and deny it.

ECF#145:20-21 (emphasis added); *see U.S. v. Vargas*, 792 F. App'x 764, 776 (11th Cir. 2019) ("A sentence is procedurally unreasonable where the court commits a 'significant procedural error, such as…selecting a sentence based on clearly erroneous facts…").

In a written order, the court cited *U.S. v. Brooks,* 270 F. App'x 847, 854 (11th Cir. 2008), to hold that the jury's not guilty verdict "is not binding on the court," and to impose the firearm enhancement for "Defendant's use of a weapon in carrying out the offense," even though Hadad was acquitted of that conduct. ECF#141:7-8. But the jury's determination *was* binding on the court, and the contrary holding in *Brooks* was inapplicable because *Brooks* predated the acquitted conduct amendment.

The commentary to the amendment provides a carveout that "[t]here may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction," and "any conduct that establishes—in whole or in part—the instant offense of conviction is properly considered." U.S.S.G. § 1B1.3 cmt. n.10. The government argued that Hadad's conduct fell "squarely" within the carveout

because Hadad's "924(c) conduct [involving the gun] was *inextricably intertwined* with the carjacking…." ECF#112:8. But possessing a firearm is not necessary to commit carjacking; and the jury unanimously rejected the government's theory that the gun was possessed during, in relation to, or in furtherance of the carjacking, and found the government failed to prove brandishing. ECF#78. These findings are *the opposite* of "inextricably intertwined."

Imposing the firearm enhancement was also error for the reasons identified by Justices Sotomayor, Kavanaugh, Gorsuch, and Barrett respecting the denial of certiorari in *McClinton v. U.S.*, a case involving the use of acquitted conduct to enhance a sentence. 143 S. Ct. 2400 (2023). The Justices cautioned that denial of certiorari "should not be misinterpreted," stating, as this Court explained in *Shanks*, "the [Sentencing] Commission had announced that it would address the issue but [the Supreme Court] would step in if the Commission did not act." *Shanks*, 2025 WL 1621179 at *3 (quoting *McClinton,* 143 S. Ct. at 2403). The Justices explained that "juries are meant to function as a check limiting the power of the state to punish" and "acquittals have special weight…because the jury has determined that the state does not have the authority to punish the alleged misconduct." *Id.*

The Sentencing Commission did act; it passed the acquitted conduct amendment, and the court was required to follow that amendment in computing Hadad's guideline. The court's failure to do so violated both the guidelines and the

Fifth and Sixth Amendments, as intimated by the Justices, *see McClinton*, 143 S. Ct. at 2401 (acquitted-conduct sentencing "raises important questions that go to the fairness and perceived fairness of the criminal justice system."), and resulted in a procedurally and substantively unreasonable sentence.

**B. The Court Erred by Denying Hadad a Reduction Under U.S.S.G. § 4C1.1(a) Based on its Erroneous Finding that Hadad "Possessed a Firearm in Connection with the Offense."**

Hadad qualified for a two-level reduction under U.S.S.G. § 4C1.1(a) because he met all the criteria for the reduction and none of the criteria for disqualification. ECF#121:18-19. The Probation Officer agreed, ECF#123:¶24, but the court erroneously sustained the government's objection, based on its finding that Hadad "possessed a firearm in connection with the offense." ECF#141; *see* U.S.S.G. § 4C1.1(a)(7) (reduction not available if defendant possessed firearm in connection with offense). For the reasons stated above, the court erred in relying on acquitted conduct regarding the firearm, then compounded the error by denying the 4C1.1(a) reduction.

**C. The Court Erred in Applying the Enhancement for Perjury/Obstruction of Justice Where there was No Evidence that Hadad's Testimony Constituted Perjury.**

Guideline 3C1.1 provides a two-level increase if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the…prosecution…of the…offense of conviction." A

defendant who testifies falsely at trial qualifies for the enhancement if the testimony was under oath; false; material; and given with the willful intent to provide false testimony and not as a result of mistake, confusion, or faulty memory. *U.S. v. Singh*, 291 F.3d 756, 763 n.4 (11th Cir. 2002).

The government sought the enhancement, claiming Hadad committed perjury when Hadad testified on cross-examination (ECF#90:147) that at the Tri-Rail parking lot, Hadad was "waiting outside [of the car] patiently," until Jean-Louis finished a call. ECF#141:12. Hadad maintained the testimony was truthful, pointing to Jean-Louis' cellphone records—shown to the jury by Hadad's counsel—which corroborated that Jean-Louis was on a call. ECF#121:10; ECF#92:74-76; 90:19; GX35a (ECF#85-56).

Without addressing the cellphone records, the court held that "abundant evidence" showed Hadad's statement constituted perjury, ECF#145:58, but did not identify any of the "abundant evidence," in contravention of *U.S. v. Dunnigan*, 507 U.S. 87, 95 (1993) ("a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out").

In its post-sentencing order, the court found that Hadad's testimony was false because Jean-Louis testified Hadad "was screaming and swearing at [Jean-Louis], and showed him a gun, [which] directly contradicts Defendant's narrative."

ECF#141:12. But the jury *credited* Hadad's testimony that he did *not* show Jean-Louis the gun, as reflected by the acquittal and special interrogatory, so the court's finding of *perjury* cannot be sustained. And, a conviction for perjury should not "rest entirely upon 'an oath against an oath,'" *Weiler v. U.S.*, 323 U.S. 606, 609 (1945), as "the uncorroborated testimony of one witness is not sufficient to prove the falsity of sworn testimony [by another witness] for perjury purposes." *U.S. v. Edmondson,* 410 F.2d 670, 674 (5th Cir. 1969).

### D. Hadad Should Have Received a Downward Adjustment for Acceptance of Responsibility.

Post-trial, Hadad submitted a statement to the probation officer genuinely apologizing and expressing regret for any fear or emotional stress he caused. ECF#123:¶15. Hadad should have received the two-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a).

"[A] defendant's choice to exercise the constitutional right to trial and thus, to hold the government to its burden—even where the defendant does not bring a constitutional challenge—does not automatically make the defendant ineligible for the [§ 3E1.1(a)] adjustment." *U.S. v. Cortes*, 299 F.3d 1030, 1038 (9th Cir. 2002). Comment 2 to the guideline provides:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial *by denying the essential factual elements of guilt,* is convicted, and only then admits guilt and expresses remorse.

U.S.S.G. § 3E1.1 comment (n. 2) (emphasis added). Hadad proceeded to trial but did not falsely deny any of the essential facts.

As to Count 2 (brandishing a firearm), Hadad admitted that he possessed a handgun but denied brandishing it. The jury acquitted Hadad, finding him credible. As to Count 1 (carjacking), Hadad did not dispute the historical facts presented by the government. But the jury was invited to convict Hadad, even if believing everything Hadad said, because the court instructed them that Hadad's intent was irrelevant and to evaluate Hadad's intent based on "what someone in the victim's position might reasonably conclude." ECF#90:154.

To determine whether Hadad's conduct, in the light most favorable to the government, constituted carjacking, required a trial, as there is no procedural vehicle to obtain summary judgment before trial. Given that Hadad admitted the essential facts, was believed by the jury, and expressed genuine remorse, he should not have been denied the acceptance of responsibility adjustment. *See, e.g.*, *U.S. v. Rodriguez*, 741 F. Supp. 12, 14 (D.D.C. 1990); *U.S. v. Perez-Franco*, 873 F.2d 455, 463 (1st Cir. 1989).

### E. Resentencing is Required Because the 96-Month Sentence was Unreasonable.

Guideline errors may be harmless if the court would have imposed the same sentence "if the guidelines issue had been decided in the defendant's favor," and such a sentence is substantively reasonable. *U.S. v. Keene,* 470 F.3d 1347, 1349 (11th

Cir. 2006). Although the district court stated that Hadad's sentence "would be the same [if] the Court erred on any of the objections," ECF#141:14; ECF#145:103, the same sentence would not be substantively reasonable.[5] The district court did not state "the reason for imposing a sentence *at a particular point within the range*," § 3553(c)(1) (emphasis added), much less why a sentence of 96 months in prison, greater than the bottom-end of the 87-108 month (Level 29) guideline range that the government sought, was "sufficient *but not greater than necessary*." 18 U.S.C. § 3553(a) (emphasis added); *see generally U.S. v. Oudomsine,* 57 F.4th 1262, 1265 (11th Cir. 2023).

Hadad's guideline range should have been 27-33 months (Level 18). ECF#121:19. That the district court would still sentence Hadad to 96 months, even if the correct guideline calculation suggests a sentence 63 months lower, underscores the substantively unreasonable nature of Hadad's sentence.

Moreover, it is antithetical to our adversarial system of justice, the "case or controversy" limitation of federal jurisdiction, and the principles animating the separation of powers, for a judge to command the government to inflict even more punishment on a citizen than the executive branch deems sufficient. After all, the

[5] If *Keene* precludes resentencing, *Keene* should be revisited en banc as it is incompatible with Congress's decision to adopt a system of Guidelines to promote sentencing uniformity. *See U.S. v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (explaining prior panel precedent rule).

decision to prosecute in the first place is effectively a political question; and the Constitution confers upon the executive the unreviewable power to veto any conviction (pardon) and reduce any sentence (commutation) with which it disagrees. It is unreasonable, therefore, for a court to impose a sentence greater than the government itself deems necessary.

## CONCLUSION

This Court should enter a judgment of acquittal. Alternatively, if the Court remands for retrial or resentencing, the case should be reassigned, given the district judge's comments at sentencing, including personal trauma the judge experienced in having had a gun pointed at him, prompting him to imagine out loud that Hadad had similarly pointed a gun at Jean-Louis, ECF#145:18-19, contrary to all the trial testimony (that the gun remained in Hadad's waistband), the acquittal of the 924(c) count, and the jury's special interrogatory (that the gun was not brandished), and an unreasonable sentence exceeding the government's request. *See U.S. v. Killen*, 729 F. App'x 703, 718 (11th Cir. 2018) (reassigning because in light of judge's remarks that notwithstanding any errors, the sentence would be identical, the judge would have "difficulty putting his previous views and findings aside"); *U.S. v. Plate*, 839 F.3d 950, 958 (11th Cir. 2016) (reassigning for resentencing where "it appear[ed] the district court may be unable to disregard its improper consideration of [a] factor or, at least, that it may appear so").

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Fed. R. App. P. 32(a) because it was prepared using Microsoft Word, 14-point font and contains 12,934 words.

Respectfully submitted,

*s/ Howard M. Srebnick*
Howard M. Srebnick
Jackie Perczek
Alexa Klein
Edward Armellino
**BLACK SREBNICK**
201 South Biscayne Boulevard
Suite 1300
Miami, FL 33131
(305) 371-6421

*Counsel for Appellant*